UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 10-103-KSF

LINK-BELT CONSTRUCTION
EQUIPMENT COMPANY, L.P., LLLP                                              PLAINTIFF

v.                                      **OPINION & ORDER**

ROAD MACHINERY & SUPPLIES CO.                                              DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court upon the motion for summary judgment filed by the Plaintiff, Link-Belt Construction Equipment Co., L.P., LLLP ("Link-Belt")[DE #30]; the motion for summary judgment filed by the Defendant, Road Machinery & Supplies Co. ("RMS")[DE #38]; the motion requesting oral argument on pending motions for summary judgment filed by RMS [DE #39]; and the motion to strike defendant's jury demand filed by Link-Belt [DE #64]. Each of these motions are fully briefed and ripe for review. The Court, having reviewed the record and being otherwise sufficiently advised, will grant the motion for summary judgment filed by Link-Belt, deny the motion for summary judgment filed by RMS, deny the motion for hearing on pending motions for summary judgment filed by RMS, and deny as moot the motion to strike defendant's jury demand filed by Link-Belt.

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The facts in this case are largely undisputed. Link-Belt is a Delaware limited liability, limited partnership headquartered in Lexington, Kentucky. Link-Belt manufactures telescopic and lattice boom cranes at its facility in Lexington and sells the cranes through a national network of

distributors. RMS is a Minnesota corporation with a principal place of business in Savage Minnesota. RMS is a supplier of industrial and construction equipment in the northern Midwest and distributes the equipment of more than twenty manufacturers, including Link-Belt. RMS has been a dealer of Link-Belt cranes since 1959. Over the course of this business relationship, the parties have had various distributor agreements. The most recent distributor agreement between the parties is dated August 14, 2006, and was amended on March 12, 2007 (the "Distributor Agreement"). [DE# 1-1]. The Distributor Agreement expired on December 31, 2007, but the parties continued their business relationship after that date. The parties dispute whether this continued relationship was on an "at-will" basis, yet still governed by the terms of the Distributor Agreement (as argued by Link-Belt) or "according to some course of dealing and understanding between the parties as to the nature of their relationship" (as argued by RMS).

On or around February 15, 2010, Link-Belt sent RMS a Notice of Termination ("Notice of Termination") informing RMS that its relationship would be terminated as of June 1, 2010 if RMS did not meet certain performance requirements, including meeting certain market-share requirements and acquiring sufficient inventory to properly serve RMS's territory. [DE #1-3]. In response, on or around March 9, 2010, RMS sent Link-Belt a letter asserting that the Notice of Termination violates Minnesota law and is in breach of the implied covenant of good faith and fair dealing under Kentucky law, requesting that Link-Belt rescind the Notice of Termination, and threatening litigation. [DE #1-4].

Link-Belt filed this action for declaratory judgment seeking a determination that it had the right to terminate the Distributor Agreement. In the alternative, Link-Belt seeks a declaration that the Distributor Agreement, having been expressly renewed to extend through December 31, 2007,

but not thereafter, is terminable at will pursuant to § 12.6 of the Agreement. RMS subsequently filed an action against Link-Belt in the District of Minnesota and, concurrently, filed a motion to dismiss or transfer this case to Minnesota. After the Court denied RMS's motion to dismiss or transfer, RMS dismissed its Minnesota Action and brought a Counterclaim against Link-Belt in this action, bringing claims for violation of the Minnesota Heavy and Utility Equipment Manufacturer and Dealers Act, Minn. Stat. § 325.068, *et seq*. ("MHUEMDA")(Count I) and for breach of contract and the implied covenant of good faith and fair dealing under Kentucky law (Count II). [DE# 23].

Both parties have filed motions for summary judgment. Link-Belt argues that, after the expiration of the Distributor Agreement, the parties' relationship continued on an "at-will" basis and, therefore, it had the right to terminate that relationship. According to Link-Belt, because Kentucky law applies to the parties' relationship pursuant to a choice of law provision of the Distributor Agreement, and because Link-Belt had no duty under Kentucky law to renew the agreement, Link-Belt is entitled to summary judgment on its Complaint and RMS's Counterclaim. RMS argues that Link-Belt's motion for summary judgment should be denied because: (1) under Fed.R.Civ.Pro. 56(d),[1] RMS requires additional discovery in order to present facts essential to justify its opposition to Link-Belt's motion; (2) Link-Belt's threatened termination violates the parties' implied agreement and the covenant of good faith and fair dealing; and (3) Link-Belt's threatened termination violates MHUEMDA. In its motion, RMS argues that it is entitled to summary judgment because the Notice of Termination fails to comply with the statutory requirements of MHUEMDA. In response, Link-

---

[1]Although RMS relies upon Fed.R.Civ.Pro. 56(f), as noted by the parties, effective December 1, 2010, Rule 56(f) was renumbered as Rule 56(d). Fed.R.Civ.Pro. 56.

3

Belt argues that, pursuant to the express terms of the Distribution Agreement, the parties' relationship is governed by Kentucky law; thus, RMS's claims under MHUEMDA necessarily fail.

**II.    STANDARD**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v.*

4

*Liberty Lobby, Inc.*, 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

### III. ANALYSIS

    A. Whether the Parties' Continued Relationship is Governed by Minnesota or Kentucky Law

As an initial matter, the Court must determine whether the law of Kentucky or Minnesota applies to the parties' dispute. Link-Belt argues that, according to the choice of law provision of the Distributor Agreement, Kentucky law applies and, therefore, RMS's claims under Minnesota law necessarily fail. RMS argues that Minnesota law applies to the dispute because Minnesota has a greater interest in the matter, including its interest in imposing its fundamental public policy to protect heavy equipment dealers by requiring manufacturers to comply with the requirements of MHUEMDA.

Significantly, as raised by Link-Belt, the Distributor Agreement contains a choice of law provision. Section 14.3 of the Distributor Agreement provides that the "[l]aws of the Commonwealth of Kentucky shall govern the construction of this Agreement and the rights, remedies and duties of the parties hereto." [DE #1-1 at p. 11]. RMS argues that, as there is no dispute that the Distributor Agreement expired by its own terms on December 31, 2007, § 14.3 is no longer applicable. However, § 13.5 of the Distributor Agreement provides:

> [Link-Belt's] acceptance of any order by [RMS] for the Products after the termination of this Agreement shall not be construed as a renewal or extension of this Agreement, nor as a waiver of termination, but in the absence of a new written agreement executed by [Link-Belt], *all such transactions shall be governed by the terms and provisions of this Agreement*.
>
> [DE #1-1 at p. 10 (emphasis added)].

5

Thus, notwithstanding the expiration of the Distributor Agreement, the terms of the Distributor Agreement, including the choice of law provision, still govern the continued relationship between Link-Belt and RMS.

Generally, a federal court sitting in diversity must apply the substantive law of the forum state. *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003). This rule includes application of the forum state's choice of law rules. *Wallace Hardware Co. Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). Accordingly, Kentucky's choice of law rules apply with regard to this matter. The Sixth Circuit has held that "in a standard commercial breach-of-contract case..., the Kentucky courts would choose to adopt § 187 of the Restatement as their analytical framework for addressing a contractual choice-of-law clause." *Id*. at 397. Section 187 provides:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either:
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice; or
>>
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.
>
> *Restatement of the Law, Second, Conflict of Laws*, § 187 (1971).

Thus, under § 187, Kentucky law, as the law chosen by the parties, will be applied if the particular issue being litigated is one which the parties could have resolved by an explicit provision in their agreement directed to that issue. "If they could have, then the choice of law provision is enforceable. Under such circumstances, there are no exceptions." *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 923 (6th Cir. 2006)(internal citations omitted).

Here, the crux of the dispute between the parties is whether Link-Belt was required to have "good cause" to terminate its relationship with RMS and whether it was required to provide RMS with time to cure its alleged performance deficiencies (as argued by RMS) or whether Link-Belt was free to terminate its relationship with RMS at will (as argued by Link-Belt). Accordingly, the Court must determine whether the parties could have resolved this issue by an explicit provision in the Distributor Agreement. Although the Distributor Agreement has expired, § 12.6 specifically addresses the nature of the continued relationship between the parties after the expiration date. Section 12.6 provides:

> Nothing contained herein shall be deemed to create any express or implied obligation on either party to renew or extend this Agreement or, if [RMS] is continued as [Link-Belt's] distributor, to create any right to continue such relationship on the same terms and conditions contained herein. Each party, in its sole discretion, may determine, for any reason whatsoever, not to renew or extend this Agreement or to continue such relationship on the terms and conditions contained herein. [Link-Belt] may, in its sole discretion, continue to deal with [RMS] after the termination date of this Agreement. Such continued dealing, without the execution of a new Agreement, will not create any obligation to extend or renew this Agreement or enter into a new agreement. *Such continued dealings shall be terminable at the will of either party*.

[DE #1-1 at p. 9 (emphasis added)].

Thus, the parties could have, and, in fact, did, resolve the issue of the nature of the relationship between the parties after the expiration of the Distributor Agreement by an explicit

7

provision of the Distributor Agreement. Specifically, the parties agreed that the continued relationship between the parties after the expiration of the Distributor Agreement was on an "at-will" basis and could be terminated by either party at any time, even without cause. Because the parties explicitly resolved this issue in the Distributor Agreement, the Court finds that the choice of law provision of the Distribution Agreement is enforceable and Kentucky law applies to this case. Because Kentucky law applies, RMS's claims under MHUEMDA necessarily fail.

RMS devotes the bulk of its briefs to arguments that, under § 187(2) of the Restatement, Minnesota law should apply to the dispute between the parties. However, as the Court finds that § 187(1) requires the application of Kentucky law, there is no need to undertake the analysis described in § 187(2).

### B. Link-Belt's Right to Terminate its Relationship with RMS

Although both parties agree that the Distributor Agreement expired on December 31, 2007, the parties do not agree as to the nature of their continued relationship after the expiration of the Distributor Agreement. However, as noted above, this issue is directly addressed by § 12.6 of the Distribution Agreement. Under § 12.6, any continued relationship between the parties after the expiration of the Distributor Agreement was on an "at-will" basis and, accordingly, could be terminated by either party at any time, even without cause. [DE #1-1 at p. 9]. Otherwise, the continued relationship is governed by the terms of the Distributor Agreement, pursuant to § 13.5 of the Distributor Agreement.

Notwithstanding the clear language of § 12.6, RMS argues that the parties' relationship continued "according to some course of dealing and understanding between the parties as to the nature of their relationship." RMS argues that the Notice of Termination explained the "terms" of

8

the continued relationship between the parties and that Link-Belt's statements in the Notice of Termination that RMS may cure its defaults under the Distributor Agreement by satisfying certain market share percentages (which Link-Belt had represented were reasonable and consistent with the expectations of all of Link-Belt's distributors) and by acquiring sufficient inventory to properly serve RMS's territory created an obligation for Link-Belt to provide RMS with notice and an opportunity to cure prior to terminating their relationship. Thus, RMS essentially argues that Link-Belt's contractual right to terminate its relationship with RMS at will was modified by the Notice of Termination. RMS also argues that there are questions of material fact regarding whether Link-Belt's market share requirements are reasonable and whether they are, in fact, being imposed upon all Link-Belt dealers. RMS further states that it believes that it cured any alleged performance deficiency.

However, as noted by Link-Belt, under Kentucky law, "a contract containing a termination without cause provision is not transformed into a 'for cause only' provision because the party terminating the contract notifies the other party that the contract is being terminated for cause." *Biber v. Duplicator Sales & Service, Inc.*, 155 S.W.3d 732, 735 (Ky. Ct. App. 2005). In *Biber*, the contract at issue provided that Duplicator Sales could terminate its contract with Biber, without cause, on 30-day written notice and, at Duplicator Sales' discretion, payment of one month's fee. Biber argued that, if Duplicator Sales had cause to terminate the contract, it was precluded from terminating it on thirty days' notice and payment of the fee but was instead required to give notice of the breach and five days to cure any deficient performance. The Kentucky Court of Appeals rejected this interpretation of the contract as "def[ying] the wording of the contract, common sense, and intent of the parties." *Id.* Thus, the fact that Link-Belt provided an explanation to RMS in the

9

Notice of Termination regarding its reasons for terminating its relationship does not mean that Link-Belt waived its right to end the at-will relationship without cause. *See Hunt Enterprises, Inc. v. John Deere Industrial Equipment Co.*, 18 F.Supp.2d 697, 700 (W.D.Ky. 1997)("It is true that Deere detailed its reasons for terminating the agreement, but we do not believe this weakens its argument that termination without cause is proper... The fact that Deere provided reasons for termination along with 120 days notice does not transform [the contractual provision providing for termination without cause] into a for cause only termination provision."). As noted by the Third Circuit Court of Appeals in *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 320 (3rd Cir. 2006):

> We also believe that it would be remarkable to hold that in order to preserve its rights to terminate a contract without cause, a party is obliged to withhold the actual reason for its action from the other party, particularly when, as here, it had had a lengthy relationship with that party. Thus, we hardly can conceive that Ingersoll-Rand could have preserved its right to terminate the Agreement without cause by writing to Elliott & Frantz that "we are terminating the Agreement without cause" but that it waived that right by indicating why it was terminating the Agreement. We cannot bring ourselves to believe that the Supreme Court of New Jersey which, as we shall explain, places much emphasis on good faith and fair dealing, would reach such a result. We hope that the obvious decline in civility in our society has not reached such a level.

In addition, Link-Belt's offer of a cure period to RMS in the Notice of Termination did not waive Link-Belt's ability to rely on its right to terminate its relationship with RMS at will. Notably, §14.4 of the Distributor Agreement, provides that, except for changes by Link-Belt permitted under the Distributor Agreement that are not applicable here, "no amendment or modification of this Agreement or any portion thereof shall be valid unless executed in writing by both parties." [DE #1-1 at p. 11]. Even if Link-Belt's offer of a cure period to RMS in the Notice of Termination could be considered a proposed modification to the terms of the relationship between Link-Belt and RMS, RMS unambiguously rejected this "offer" by responding to the Notice of Termination with a request

10

that Link-Belt rescind the Notice of Termination and threatening to take "more formal" action. [DE #1-4].

Thus, RMS's reliance on *City of Owensboro v. Sabo*, 2006 WL 1113586 (Ky. Ct. App., April 28, 2006)(unpublished) is misplaced. According to RMS, *Sabo* stands for the proposition that, under Kentucky law, the implied covenant of good faith and fair dealing prohibits a party from claiming that it will fairly evaluate a contract extension and then later stating that the contract is terminable at will. In *Sabo*, Sabo was originally an at-will employee, employed on a twelve-month probationary basis. The parties later entered into a separate written agreement extending Sabo's probationary period for six months to permit further evaluation of Sabo's performance. The Kentucky Court of Appeals held that this separate agreement gave rise to an obligation of the City of Owensboro to undertake the evaluations promised in the subsequent agreement in good faith. *Id.* at *7. Although recognizing the rule that there is generally no cause of action for breach of the implied duty of good faith and fair dealing available for probationary, at-will employees, the Court of Appeals found that "the Agreement Sabo entered into with the City brought him out of [the at-will] category, albeit limited to his claim that the City be required to fairly evaluate him." *Id.* at *6-*7. Thus, having agreed to evaluate Sabo, the City of Owensboro was obligated to do so in good faith. *Id.* at *7.

However, *Sabo* is distinguishable from the case at hand because, in *Sabo*, it was the separate agreement entered into by both parties, and not the previous at-will relationship, that gave rise to "an inherent promise by the City to perform these evaluations in good faith." *Id*. In addition, even the lower court in *Sabo* recognized that the facts of the case involved a "unique sequence of events," in that an at-will employee and his employer entered into a subsequent agreement extending the employee's probationary period, specifically for the purpose of allowing further evaluation of the

11

employee. *Id*. at *5. Here, there was no "separate agreement" between Link-Belt and RMS that RMS could "cure" its alleged performance deficiencies by meeting certain performance requirements within a given period of time. Indeed, RMS rejected such an opportunity and instead threatened litigation if the Notice of Termination (including Link-Belt's cure period "offer," which RMS insisted was "unreasonable") was not rescinded.

Moreover, the covenant of good faith and fair dealing, implied in each contract under Kentucky law, does not preclude Link-Belt from exercising its contractual right to terminate its relationship with RMS. *See Farmers Bank and Trust Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005)("An implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights."); *Travelers Ins. Co. v. Corporex Properties, Inc.*, 798 F.Supp. 423, 425 (E.D.Ky. 1992)("It is not 'inequitable' or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained.")(internal citations omitted). In this case, § 12.6 of the Distributor Agreement specifically provides that if the parties chose to continue their business relationship after the termination of the Distributor Agreement, that continued relationship could be terminated at the will of either party. The duty of good faith and fair dealing does not impede this contractual right. *See Hunt Enterprises, Inc. v. John Deere Industrial Equip. Co.*, 18 F.Supp.2d 697, (W.D.Ky. 1997)("[M]any courts have held that the implied covenant [of good faith and fair dealing] may not be applied to limit a clear contractual provision allowing termination of the contract without cause.")(alterations in original)(internal citations omitted).

RMS further argues that, at the very least, the Notice of Termination creates an issue of material fact regarding the terms of the relationship between Link-Belt and RMS after the expiration

of the Distributor Agreement. However, as provided by the clear, unambiguous language of § 13.5, the terms of the Distributor Agreement continued to govern this relationship. Further, as explained above, the Notice of Termination did not modify the terms of this continued relationship.

          C.        <u>Application of Kentucky's Retail Sales of Farm Equipment Act</u>

RMS argues that, even if the Court finds that MHUEMDA does not apply, the Court should find that RMS is provided extra-contractual protections against non-renewal without good cause by Kentucky's Retail Sales of Farm Equipment Act, KRS 365.800, *et seq*.[2] Specifically, KRS § 365.831 prohibits suppliers from "terminat[ing] or substantially chang[ing] the competitive circumstances of a retail agreement contract without good cause." KRS § 365.831. For purposes of this statute, "good cause" includes "the failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement contract if the requirements are not different from those imposed on other retailers similarly situated in this state." *Id*.

Link-Belt argues that the statute's reference to "other retailers similarly situated *in this state*" indicates the Kentucky legislature's intent that the protections of the statute only apply to retailers located within Kentucky. According to Link-Belt, the Sixth Circuit has consistently held that, absent an indication that the state legislature intended otherwise, state regulatory statutes similar to Kentucky's Retail Sales of Farm Equipment Act will not be applied extraterritorially, even when the state's law is selected by the parties' choice of law provision. In support of this argument, Link-Belt refers to a string of cases where the Sixth Circuit has declined to extend the protections of various

---

[2]As recognized by Link-Belt, despite the reference to "Farm Equipment", the definition of inventory provided by KRS § 365.800(3) includes "farm implements, tractors, farm machinery, consumer products, utility and industrial equipment, construction and excavating equipment, and any attachments, repair parts, or superseded parts for the equipment." KRS § 365.800(3). This definition is broad enough to include cranes.

state statutes, including KRS § 190.047(6) governing Motor Vehicle Sales, the Illinois Franchise Disclosure Act and the Wisconsin Fair Dealership Law, to entities located outside of those respective states. *See Highway Equipment Co. v. Caterpillar Inc.*, 908 F.2d 60 (6th Cir. 1990); *BMW Stores, Inc. v. Peugeot Motors of America, Inc.*, 860 F.2d 212, 214 (6th Cir. 1988); *Bimel-Walroth Co. v. Raytheon Co.*, 796 F.2d 840 (6th Cir. 1986). However, in each of these cases, the statutes at issue provided a clear indication from the respective states legislatures, either through statements regarding the purpose of the statutes or through the applicable definitions, that the statutory protections were intended to apply only to state residents. For example, in *Highway Equipment Co.*, the court noted that, in 1998, the Illinois legislature reenacted the Illinois Franchise Disclosure Act and specifically confirmed that the statute is intended to protect Illinois residents only. *Highway Equipment Co.*, 908 F.2d at 63 (citing Ill. Rev. Stat. ch. 121 1 / 2, ¶ 1702). Likewise, in *BMW Stores, Inc.*, the court relied on an affidavit submitted by the Executive Director of Kentucky's Motor Vehicle Commission and the express, declared policy of Chapter 190 of the Kentucky Motor Vehicle Code to hold that KRS § 190.047 only provides protections to citizens of the state of Kentucky and would not be applied for the benefit of an out-of-state dealer. *BMW Stores, Inc.*, 860 F.2d at 215 ("Further, the declared policy of Chapter 190 of the Kentucky Motor Vehicle Code states that since the sale of vehicles "*within this state* virtually affects the general economy *of this state*," the regulation of dealership and distributors "doing business in the state" is meant, in part, "to protect and preserve the investments and properties of *the citizens of this state*.")(quoting KRS § 190.015)(emphasis in original). Similarly, in *Bimel-Walroth Co.*, in holding that the Wisconsin Fair Dealership Law did not apply to a dealer located outside of Wisconsin, the court relied on the language of the statute specifically defining "dealer" as "a person who is a grantee of a dealership *situated in the State of*

14

*Wisconsin.*" *Bimel-Walroth Co.*, 796 F.2d at 842-42 (quoting Wis. Stat. § 135.02(5))(emphasis added).

Contrary to the statutes discussed in these cases, the language in KRS § 365.831 referring to requirements imposed on "other retailers similarly situated in this state" does not evidence the same clear intention to limit the application of KRS § 365.831 to retailers located in Kentucky. At most, the reference to "other retailers similarly situated in this state" indicates that, in evaluating the existence of "good cause," the requirements imposed upon the retailer by the retail agreement should not be different from those imposed on other retailers similarly situated in Kentucky. Based on the language of the statute, it does not appear to make a difference whether the retailer being evaluated is located in Kentucky or in another state.

However, Link-Belt also argues that it did not make a decision to terminate the Distributor Agreement, but rather made the decision not to renew the Distributor Agreement after it had expired. Link-Belt argues that KRS § 365.831(1) does not apply to a decision not to renew a distributor agreement which has expired by its own terms. According to Link-Belt, the "good cause" requirement imposed by KRS § 365.831(1) only applies to decisions to "terminate" or "substantially change" an effective "retail agreement contract." Link-Belt notes that, in other contexts, such as the requirements of Kentucky's statutes governing Motor Vehicle Sales, the Kentucky legislature has specifically indicated that the "good cause" requirement also applies to decisions "not to renew" a franchise. KRS § 190.045(1)(providing that a manufacturer "shall not cancel, terminate, *or fail to renew* any franchise with a licensed new motor vehicle dealer" unless the manufacturer has met several requirements, including having good cause for "cancellation, termination, or nonrenewal.")(emphasis added). Link-Belt further relies on statutes, such as the federal Petroleum

15

Marketing Practices Act, that distinguish between "nonrenewal" and "termination," defining each term separately and imposing distinct requirements for each. Link-Belt also points to dealer protection statutes of surrounding states that distinguish between "termination" of a retail contract and non-renewal of an expired contract. [DE #30-1 at pp. 25-27].

In this case, although the applicable Agreement has expired, the parties agreed that their continued relationship would be terminable on an "at-will" basis. Thus, rather than a termination of an existing retail agreement, the Court agrees that this situation involves Link-Belt's decision not to renew an expired agreement and to terminate its at-will relationship with RMS. By its terms, KRS § 365.831(1) does not apply to a supplier's decision not to renew an expired agreement and to terminate an at-will relationship. Thus, under these particular circumstances, KRS § 365.831 does not impose a "good cause" requirement on Link-Belt's decision to terminate its relationship with RMS.

Accordingly, Kentucky law does not otherwise limit Link-Belt's right to terminate its relationship with RMS. Because Link-Belt was free to terminate its relationship with RMS at will, both pursuant to the contract and under Kentucky law, RMS's arguments that Link-Belt's market share requirements are unreasonable and are not imposed upon all Link-Belt dealers, as well as its argument that it sufficiently cured any performance deficiencies, are irrelevant.

    D. <u>RMS's Request for Additional Discovery</u>

In response to Link-Belt's motion for summary judgment, RMS argues that, under Rule 56(d), it needs additional discovery in order to allow it to present facts essential to justify its opposition. Rule 56(d) of the Federal Rules of Civil Procedure provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.
>
> Fed R.Civ.Pro. 56(d).

The Sixth Circuit Court of Appeals has stressed that "[t]he importance of complying with [Rule 56(d)] cannot be overemphasized." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000). "Beyond the procedural requirement of filing an affidavit, [Rule 56(d)] has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Id*.

With respect to the contents of the Rule 56(d) affidavit,

> It is not an abuse of discretion for the district court to deny the discovery request when the party "makes only general and conclusory statements [in its affidavit] regarding the need for more discovery and does not show how an extension of time would have allowed information related to the truth or falsity of the [document] to be discovered." *Ironside v. Simi Valley Hosp.*, 188 F.3d 350, 354 (6th Cir. 1999). It is also not an abuse of discretion to reject a [Rule 56(d)] affidavit as insufficient to support further discovery when the affidavit lacks "any details" or "specificity." *Emmons v. McLaughlin*, 874 F.2d 351, 357 (6th Cir. 1989).

*Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004).

"A party who opposes a motion for summary judgment by seeking additional discovery under [Rule 56(d)], however, 'has not absolute right to additional time for discovery... The nonmoving party must show how postponement of a ruling on the motion will enable him to rebut the motion for summary judgment." *Allen v. CSX Transp., Inc.*, 325 F.3d 768, 775 (6th Cir. 2003)(quoting *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 409 (6th Cir. 1998). Thus, if the discovery sought by

17

the nonmoving party has no bearing on the determinative legal issue presented by the motion for summary judgment, it is not necessary to afford the nonmoving party additional time for discovery before ruling on the motion for summary judgment. *Allen*, 325 F.3d at 776. *See also Toms v. Taft*, 338 F.3d 519, 523 (6th Cir. 2003).

RMS argues that, in order to adequately respond to Link-Belt's motion for summary judgment, it needs additional discovery into whether Link-Belt had "cause" to terminate the Distributor Agreement. In support of its argument, RMS relies on the affidavit of Jeffery Haff, its counsel in this case. Specifically, Haff states that, without further discovery, RMS is not in a position to fully and fairly address any argument that Link-Belt may make about the reasonableness of the terms of the Notice of Termination, including whether the "requirements" imposed upon RMS by the Notice of Termination are uniformly applied to all Link-Belt dealers. [DE #37-1]. In addition, Haff further states that it is possible that internal Link-Belt documents or e-mails discussing the terms of the parties' agreement after the expiration of the Distributor Agreement, the "true reason" for terminating RMS, or whether RMS is being treated unreasonably or in a discriminatory manner, may exist. Haff states that, to the extent that these documents exist, they had not yet been produced to RMS by November 19, 2010, the date that Haff executed his affidavit. However, as the Court finds that the parties' continued relationship after the expiration of the Distributor Agreement was on an "at-will basis" and that cause was not required for termination, the additional discovery requested by RMS is irrelevant to the Court's determination of the instant motions for summary judgment. Thus, RMS has failed to demonstrate that Rule 56(d) presents an obstacle to this Court's determination of the pending motions for summary judgment.

IV.   RMS's Motion Requesting Oral Argument on Pending Motions

RMS has requested oral argument on the parties' cross motions for summary judgment. However, the Court finds that the arguments are adequately presented in the briefs and, therefore, a hearing is not necessary.

V.    RMS's Motion for Summary Judgment

RMS's motion for summary judgment argues that Link-Belt's Notice of Termination fails to comply with the requirements of MHUEMDA. As the Court has determined that Kentucky law, and not Minnesota law, applies to this dispute, RMS's motion is denied.

VI.   Conclusion

For the reasons set forth above, the Court, being fully and sufficiently advised, hereby **ORDERS** as follows:

(1)   Plaintiff's motion for summary judgment [DE #30] is **GRANTED**;

(2)   the Distributor Agreement between Plaintiff and Defendant dated August 14, 2006, and amended on March 12, 2007, having been expressly renewed to extend through December 31, 2007, but not thereafter, is terminable at will pursuant to § 12.6 of the Agreement;

(3)   Defendant's counter-claim against Plaintiff [DE #23] is **DISMISSED WITH PREJUDICE**;

(4)   Defendant's motion for summary judgment [DE #38] is **DENIED**;

(5)   Defendant's motion requesting oral argument on pending motions [DE #39] is **DENIED**;

(6)   Plaintiff's motion to strike defendant's jury demand [DE #64] is **DENIED** as moot;

(7)   judgment in favor of Plaintiff will be entered contemporaneously herewith;

(8)   the pretrial conference and trial of this matter, currently set for May 5, 2011 and May 24, 2011, respectively, are hereby **SET ASIDE**;

(8)     this matter is **STRICKEN** from the active docket of the Court; and

(9)     this is a final and appealable Order and no just cause for delay exists.

This April 15, 2011.

Signed By:
*Karl S. Forester* KSF
**United States Senior Judge**